## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Jul 16 2018, 9:04 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

| ATTORNEY FOR APPELLANT | ATTORNEY FOR APPELLEE |
|---|---|
| Dylan A. Vigh | Casey D. Cloyd |
| Indianapolis, Indiana | Indianapolis, Indiana |

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Richard Frye, | July 16, 2018 |
| *Appellant-Petitioner,* | Court of Appeals Case No. 49A05-1711-DR-2671 |
| v. | Appeal from the Marion Superior Court |
| Sarah (Frye) Mosby, | The Honorable Gary L. Miller, Judge |
| *Appellee-Respondent.* | Trial Court Cause No. 49D03-0907-DR-35132 |

**Riley, Judge.**

# STATEMENT OF THE CASE

Appellant-Petitioner, Richard Frye (Father), appeals the trial court's order granting guardianship over his adult son, Nathaniel Frye (Nathaniel), in favor of Appellee-Respondent, Sarah Mosby (Mother).

We reverse and remand for further proceedings.

# ISSUE

Father raises two issues on appeal, which we restate and consolidate as the following single issue: Whether a reversible error occurred because Nathaniel's interests were not represented by a guardian *ad litem* during the guardianship proceedings.

# FACTS AND PROCEDURAL HISTORY

Nathaniel was born on April 30, 1998, and is the adult son of Mother and Father, who were married for approximately twenty years and dissolved their marriage by agreement in 2011. In that agreement, the parties resolved to have joint legal custody over Nathaniel, with each parent having Nathaniel two weeks at a time.

Nathaniel has "mild to moderate" autism spectrum disorder, as well as delays in cognitive, language, development, and social skills that often accompanies it. (Tr. Vol. II, p. 14). Due to his cognitive impairment, Nathaniel "displays a limited ability to count, know the alphabet, and to process information." (Appellees' App. Vol. II, p.4). Nathaniel has the mentality "of a five-to an

eight-year-old." (Tr. Vol. II, p. 13). Additionally, Nathaniel is legally blind in his left eye, and due to the glaucoma in his right eye, he has partial vision. Due to his various disabilities, Nathaniel has attended Indiana School for the Blind and Visually Impaired (the School) since 2001, where he is currently enrolled and he is expected to remain in the School until he turns twenty-two. The School offers numerous after-school activities for its students, and Nathaniel participates in Boy Scouts, ukulele club, choir, student council, best buddies, and beekeepers club. Nathaniel is not interested in academic subjects, but he likes the social aspect of attending the School. Other than his apparent disability, by all accounts, Nathaniel is a healthy young man, who enjoys watching movies, and having social interaction with others.

[7] After the parties' divorce, Mother reconnected with an old flame, Mathew Mosby (Mosby), and they eventually got married. Mother and Mosby reside in Marion County, Indiana. Together, they have two minor children—a boy born in 2013 and a girl born in 2016. Mother and Mosby also have three dogs. For approximately nineteen years, Mother has worked for Resort Condominiums International (RCI) where she receives telephone inquiries from people and she prepares vacation schedules for them. RCI offers insurance coverage for Mother's family, including Nathaniel. Due to Mother's poor eyesight, which only affects her driving, Mosby transported Mother to work. Although Nathaniel took the bus to the School, whenever he needed to be retrieved, Mosby would provide transportation for him. Mosby does not work and stays at home to care for Nathaniel and his two minor children. As for Father, in

2015, he married Sally Frye (Sally), and both reside in Danville, Indiana, with their two dogs and three cats. Father works from home for an insurance company, and Sally works as a caterer for a hospital.

[8] On March 31, 2014, Mother filed a petition to modify the parties' alternating two-week parenting time schedule, claiming that it was no longer in Nathaniel's best interest. On October 23, 2014, Father filed his response and instead sought sole legal custody of Nathaniel. On December 4, 2014, Father requested the trial court to appoint a guardian *ad litem* for Nathaniel. On January 21, 2016, the trial court appointed Lowell Shroyer (GAL Shroyer) for Nathaniel. After conducting his investigation, GAL Shroyer filed his confidential report with the trial court in February 2016. GAL Shroyer's report found areas of concern with Father's home. He noted that the drive way to Father's home was covered with an "extraordinary amount of tobacco products." (Appellee's App. Vol. II, p. 5). Also, GAL Shroyer noted that Father had two dogs and three cats, and he detected a "large amount of pet dander" within the home. (Appellee's App. Vol. II, p. 5). As for Mother's home, GAL Shroyer did not perceive any alarming issues and he concluded that despite the dogs, it was "fairly neat, clean and tidy." (Appellee's App. Vol. II, p. 5). At the end of his report, GAL Shroyer cited the discord and breakdown of communication between Mother and Father regarding Nathaniel's parenting schedule, and he concluded that the sustenance of the parties' existing alternating two-week parenting schedule was dependent "upon the willingness of the parties to communicate." (Appellee's App. Vol. II, p. 9). GAL Shroyer further recommended that if Nathaniel

was to reside primarily in (1) home it appears that Mother's home provides a cleaner, healthier environment than [] Father's home. Mother and [Mosby] seem to have a realistic understanding of [Nathaniel's] abilities, and the needs he has now, and will have in the future. Mother seems to be more supportive of [Nathaniel's] relationship with Father than Father does of [Nathaniel's] relationship with Mother. The GAL must conclude that [Nathaniel's] relationship with Mother will greatly suffer if [Nathaniel] resides primarily with Father.

(Appellee's App. Vol. II, p. 9).

[9] On February 24, 2016, the trial court conducted an all-day evidentiary hearing on the parties' pending petitions and thereafter took the matter under advisement. While awaiting the trial court's ruling on the pending motions, Nathaniel turned eighteen-years-old. On May 5, 2016, Mother filed a petition to establish guardianship over Nathaniel, in a different court. On May 25, 2016, Father filed a motion to intervene, where he sought to be joined as a necessary party in Mother's guardianship petition. In addition, Father filed a competing petition against Mother's guardianship petition and he equally sought guardianship over Nathaniel. The guardianship court subsequently appointed Joseph Shikany (GAL Shikany) as Nathaniel's new guardian *ad litem*. It appears that GAL Shikany did not conduct a new investigation or prepare a report for the trial court. Then approximately one month after Mother had filed her guardianship petition, on June 7, 2016, the trial court issued its order granting Mother sole legal and physical custody of Nathaniel, with Father exercising parenting time in accordance with the Indiana Parenting Time Guidelines (Guidelines).

[10] On November 21, 2016, the trial court ordered the guardianship proceedings be transferred to the post-dissolution court where Mother and Father had previously filed their motions for modifying custody and parenting time.

[11] At a two-day hearing, held on May 31 and continued to July 5, 2017, the parties each presented multiple witnesses, including Mosby—Mother's husband, Sally—Father's wife, and Jessica Frye (Jessica)—the parties' oldest daughter. Nathaniel was excused from attending the hearing, and GAL Shikany did not testify nor did he present the trial court with his recommendations. In addition, the trial court took judicial notice of the evidence admitted during the custody modification hearing, the accompanying order granting Mother sole legal custody, and GAL Shroyer's report, which was approximately fourteen months old.

[12] During the guardianship hearing, Mother testified that she was conversant with the complexities associated with Nathaniel's autism, and that she provided him with a safe and stable environment capable of meeting his needs. Mother testified that due to Nathaniel's glaucoma in his right eye, she took him to the ophthalmologist for quarterly eye checkups. Also, she indicated that she daily administered Nathaniel's glaucoma eye drop medicine. Mother stated that through her employer, she provided Nathaniel with health insurance, and that she had successfully applied for Social Security disability benefits on behalf of Nathaniel. Mother stated that she used an over-the-counter allergy medication to manage Nathaniel's allergies to cigarette smoke and pet dander. Mother supervised Nathaniel's personal hygiene. While Nathaniel could bath himself

and brush his teeth, Mother monitored his efforts. Mother claimed that Nathaniel's overall dental health was good. Mother additionally oversaw Nathaniel's haircuts and she stated that Nathaniel had no dandruff. While Nathaniel exhibited teenage acne, Mother addressed it with over-the-counter acne topical creams. Lastly, Mother claimed that after the trial court granted her sole legal and physical custody over Nathaniel in 2016, Nathaniel became more social, and that he spends more time with his four-year-old half-brother and his one-year-old half-sister. Mother opined that if she was granted guardianship, Nathaniel would benefit from a continuation of his relationships with her husband Mosby and half-siblings, all of whom live with Mother in her home.

[13] Mosby testified that he managed Mother's household and cared for his two minor children, as well as Nathaniel. Mosby posited that since Mother was granted sole legal custody of Nathaniel in 2016, Nathaniel's health has vastly improved. Mosby additionally testified that due to Nathaniel's poor vision, the School had been working with Nathaniel by establishing obstacle courses so that Nathaniel would be more "aware or watch[] how he's walking." (Tr. Vol. II, p. 122). Mosby testified that "a couple times a week," he would set up "like an obstacle course" inside the house for Nathaniel to challenge. (Tr. Vol. II, p. 121). Also, Mosby stated that he and Nathaniel have a common interest in music and loved playing the ukulele together. He claimed that he and Nathaniel also enjoy taking walks outside. Mosby testified that Nathaniel was well bonded with his half-siblings. He also claimed that Nathaniel loved

electronic gadgets such as "Alexa," and he enjoyed watching movies through a projector. (Tr. Vol. II, p. 122). As for house chores, Mosby stated that Nathaniel can pick up his room; make his bed; "he does a pretty good job. He is getting better at it. He does - -take care of his dishes. He will rinse them off. He will even come over and grab a rag and go back over and wipe off his area when he is done. He's pretty limited on what he can do on his own, but he tries to help." (Tr. Vol. II, p. 123). Mosby stated that the family had meals together at the table, and Nathaniel "usually likes to lead the prayer." (Tr. Vol. II, p. 124).

[14]    As noted, the School offers several after-school activities for its students, and Nathaniel participates in Boy Scouts, ukulele club, choir, student council, best buddies, and beekeepers club. Nathaniel enjoys the social aspect of attending the School. Father then claimed that after Mother was granted sole legal and physical custody of Nathaniel in 2016, Mother removed Nathaniel from all the above activities. Because of Mother's actions, Father posited that Nathaniel's life skills have significantly diminished and that Nathaniel appears to be more agitated and withdrawn. Father stated that he had previously taught Nathaniel to independently groom himself, and attend to his own bathroom needs. Father testified that Nathaniel is "back to asking" when he can go to the bathroom. (Tr. Vol. II, p. 237). Father blamed Mother for Nathaniel's regression.

[15]    At the close of the evidence, the trial court took the matter under advisement pending submission of the parties' proposed findings. On October 30, 2017, the

trial court issued its findings of facts and conclusion thereon granting Mother's guardianship petition. Among other things, the trial court entered the following findings and conclusions

16. Having reached the age of majority, [Nathaniel] is now an incapacitated person in need of the appointment of a guardian to manage his affairs and assist him in self-care on a daily basis.

17. Mother and Father each believe that they are best suited to be appointed the sole guardian of [Nathaniel's] person and estate, but each party has varying perspectives on a schedule for visitation with the other parent.

18. Mother believes that the current schedule of minimum parenting time for Father is appropriate.

19. Father believes that the reduction of time that [Nathaniel] has spent with him has caused confusion for [Nathaniel] and has fractured in the bond between [Nathaniel] and the members of his family who reside in Father's home. Father would propose a "week on/week off' alternating schedule for parenting time.

20. Father, Father's wife, Sally [], Mother, and Father's daughter, Jessica [], each testified independently that since the change in parenting time schedule, they have observed [Nathaniel] to be increasingly short tempered, less affectionate, and in need of constant re-assurance that he is wanted in their house.

21. [Mosby] believes that, since the change in parenting time schedule, [Nathaniel] becomes more agitated prior to transfers and becomes frustrated about what he might be missing out on at Mother's home, which require Mother and [Mosby] to review

everything that [Nathaniel] will be missing, just prior to going to Father's home for parenting time.

\*\*\*

25.  Whenever opportunities arise for [Nathaniel], Mother and Father's inability to communicate with each other hamper [Nathaniel's] experience.

26.  Communication between the parties does not appear to have improved during the period that Mother has had sole custody.

27.  Specifically, Father provided a series of emails in which he requested information from Mother, only to be told by Mother that it had been handled, but without providing additional information.  In these emails, Mother repeatedly reminds Father that she has "SOLE" custody and that he needs to just do as she says.  The [c]ourt finds the use of capitalized letters in the email to be enlightening of Mother's unwillingness to accommodate Father's request.

\*\*\*\*

30.  At the last [custody] hearing, the [c]ourt heard significant testimony regarding the process for obtaining braces for [Nathaniel] which began in 2014.  At the time, Father asserted he could not complete the set up for the braces without Mother's consent, and Mother indicated that her consent was withheld because both financial issues and a desire for a second opinion.

31.  More than a year after that hearing, and three (3) years since the initial recommendation for braces, it does not appear that [Nathaniel] has yet been fitted with the recommended braces.

32. Parents cannot agree on simple matters like haircuts and showering.

****

36. Mother and Father differ in their perspectives with regards to involvement at [Nathaniel's] school. Currently, [Nathaniel] attends school at the Indiana School for the Blind and Visually Impaired. . . .

37. At the time of the last hearing, [Nathaniel] was involved in several extra-curricular activities at [the School], and he was occasionally permitted to spend the night in the dorms at the [S]chool. However, [Nathaniel] was only allowed this privilege during Father's time, as Mother believed that [Nathaniel] "has a perfectly good bed" at her home and that there was no reason for [Nathaniel] to spend the night at the [S]chool.

****

38. Father has emphasized that he believes a time will come in [Nathaniel's] life when he may [] need to live outside of the home of an immediate family member, and Father believes that slow, consistent introduction to a routine of being away from home will make any later transition necessary less traumatic to [Nathaniel].

39. Since the change in custody, [Nathaniel's] activities have significantly decreased and he spends increasing amounts of time solely with his nuclear family at Mother's home.

****

# CONCLUSIONS OF LAW

8. Both parents are qualified, willing, and capable to serve as guardians, and each parent has expressed desire, through their filings and testimony, to serve as guardian.

****

13. Both parents have a history of acting, with genuine intentions, on what they believe to be in [Nathaniel's] best interest.

14. The [c]ourt is convinced that the desired improvement in communication and cooperation, as hoped for by [GAL Shroyer] while [Nathaniel] was under Mother's authority, has not happened.

15. It does appear that, following the change in schedule, [Nathaniel] has regressed in both language and motor skills.

16. The [c]ourt must enter orders to encourage development of the incapacitated person's self-improvement, self-reliance, and independence and to contribute to the incapacitated person's living as normal a life as that person's condition and circumstances permit without psychological or physical harm to the incapacitated person. . . .

17. The parties in the matter agree, without argument, that [Nathaniel] will never achieve fully independent living, or self-reliance.

18. However, this [c]ourt does believe that it is in [Nathaniel's] best interest that he be encouraged and assisted in achieving whatever level of accomplishment or personal successes he is capable of with the assistance of those around him.

19. The [c]ourt considers the accomplishment of these tasks to be a benefit to [Nathaniel] and the development and maintenance of those skills, however minimal others may deem them, to be in his best interest as they are the closest things that [Nathaniel] may ever reach to an independent life and he is entitled to that level of dignity.

20. The [c]ourt is concerned about the decrease, while in Mother's care, in activities and increase of what the [c]ourt considers "sheltering" of [Nathaniel's] at the expense of participation in programs and experiences he could have had over the last year.

21. The [c]ourt is also concerned that Mother distances Father from [Nathaniel] and give preference to [Nathaniel's] connection to [Mosby] and [Mosby's] family.

22. The [c]ourt feels strongly that it is in [Nathaniel's] best interest to have and maintain strong relationships and bonds with all of the adults in his life as well as his siblings, cousins and extended family.

23. The [c]ourt has concerns with Father's tone in communication with Mother but sees modest improvements over the last year which indicates that the [c]ourt's prior admonishments have made an impression on Father.

24. The [c]ourt believes that, while their communication between each other is lacking, Mother is in a better position to be able to offer [Nathaniel] hands-on skill building attention on a daily basis as well as the temperament to address medical and hygienic issues for [Nathaniel] promptly and effectively.

25. Further, the [c]ourt believes that both parents share a realistic perspective and approach to making decisions that are in Nathaniel's best interest for the [long-term] needs that [Nathaniel] will no doubt have.

26. The [c]ourt believes strongly that it is [Nathaniel's] best interest to return to a more consistent parenting time schedule, but still believes that the two week on/two week off schedule is not in [Nathaniel's] best interest.

27. The [c]ourt believes that Father's proposal for week on/week off visitation schedule is not in [Nathaniel's] best interest.

28. The [c]ourt believes that it is in [Nathaniel's] best interest that both parents continue to have access to information regarding [Nathaniel's] medical needs and education and believes it is necessary, for medical care provider's clarity, that they be given copies of this [c]ourt's orders which gives each parent the authority to obtain information while restricting decision making authority to the guardian solely.

29. For the foregoing reasons and other, this [c]ourt determines that it is in [Nathaniel's] [] best interest that Mother be appointed sole [g]uardian of both the person and estate of Nathaniel [] and that Father be given [p]arenting [t]ime pursuant to the Indiana Parenting Time Guidelines with exchanges at a central meeting location to be determined by agreement of the parties.

30. Mother is appointed to serve as [g]uardian with no other specific limitation so her authority than those enumerated herein related to the [c]ourt's expectations as to how Mother shall communicate with Father and in providing for a visitation schedule for Father.

(Appellant's App. Vol. II, pp. 7-18).

Father now appeals. Additional facts will be provided as necessary.

# DISCUSSION AND DECISION

Father claims that the trial court committed a reversible error by failing to appoint a guardian *ad litem* to represent and protect Nathaniel's interests during the guardianship proceedings. He argues that Indiana Trial Rule 17(C) mandates the appointment of a GAL for incompetent persons. Trial Rule 17(C) provides, in part, that "[I]f an infant or incompetent person is not represented, or is not adequately represented, the court shall appoint a guardian [*ad litem*] for him." Indiana Code section 29-3-2-3 uses the language similar to Trial Rule 17(C), providing, in pertinent part, that

> (a) Unless waived under subsection (b) or if section 4 of this chapter does not apply, the court shall appoint a guardian [*ad litem*] to represent the interests of the alleged incapacitated person or minor if the court determines that the alleged incapacitated person or minor is not represented or is not adequately represented by counsel. If not precluded by a conflict of interest, a guardian [*ad litem*] may be appointed to represent several persons or interests. The court as part of the record of the proceeding shall set out its reasons for appointing a guardian [*ad litem*].

Notwithstanding Father's argument that a guardian *ad litem* was not appointed, the record demonstrates that after Mother filed her guardianship petition, and Father filed his cross petition on the same, the trial court appoint GAL Shikany. The record is silent as to whether his role was terminated following

the transfer of the guardianship case into the post dissolution court and we believe his appointment remained active. Nonetheless, GAL Shikany did not testify on behalf of Nathaniel at the evidentiary hearings, nor did he file recommendations with the trial court.

[19] During the guardianship hearing, evidence was presented that between the latest custody order in 2016 and the guardianship order in 2017, Nathaniel had been living with Mother, and Father was exercising parenting time on alternating weekends. Nathaniel, who has the mentality "of a five-to an eight-year-old," was not interested in academic subjects, but he enjoyed the social aspect of attending the School. (Tr. Vol. II, p. 13). Both parties testified that prior to the custody order in 2016, Nathaniel was enrolled in several after-school activities. Following the custody order in 2016, Mother removed Nathaniel from almost all of his extra-curricular activities. Mother testified that Nathaniel's social skills have not diminished, rather, they have improved over time. Contrary to Mother's testimony, Father testified that Mother's actions of removing Nathaniel from his extra-curricular activities, led Nathaniel's social skills to diminish and he observed that Nathaniel appeared to be more withdrawn and agitated. Father additionally testified that he had previously taught Nathaniel to attend to his own bathroom needs, but he is now "back to asking" when he can go to the bathroom. (Tr. Vol. II, p. 237). Father blamed Mother for Nathaniel's regression.

[20] We recognize that role of a guardian *ad litem* is to "represent and protect" the best interests of an incapacitated person by researching, examining, advocating,

facilitating, and monitoring the incapacitated person's situation. *See* I.C. § 31-9-2-50. Further, Indiana Code section 29-3-8-1(b) provides, in part, that a guardian to "an incapacitated person is responsible for the incapacitated person's care" needs, and opportunities. We find one conclusion, in association with others, particularly worrisome, and we believe that active input of a guardian *ad litem* was necessary under the circumstances.

[21] While the trial court conclude that Nathaniel "would never achieve" full independence or self-reliance, he should be under the care of guardian who would encourage his "development and maintenance of those skills, however minimal others may deem them, to be in his best interest as they are the closest things that [Nathaniel] may ever reach to an independent life." (Appellant's App. Vol. II, p. 16). The trial court found Father's testimony credible, and in conclusion #15, it concluded that "[I]t does appear that, following the change in schedule, [Nathaniel] has regressed in both language and motor skills." (Appellant's App. Vol. II, p. 15). Also, in conclusion #20, the trial court viewed Mother's actions of removing Nathaniel from extracurricular activities as Mother's attempt of "sheltering" Nathaniel from programs that would enhance his independence and life skills. (Appellant's App. Vol. II, p. 15).

[22] Here, the trial court took judicial notice of the evidence admitted during the custody proceeding, which included GAL Shroyer's report. However, by the time the guardianship proceeding was held, fourteen months had passed, rendering that report objectively stale. Moreover, the report contained information regarding Nathaniel's adjustment and experiences with a radically

different custodial and parenting time arrangement. In fact, the only evidence heard at the guardianship hearing concerning Nathaniel's welfare and self-advancement came from Mother, Father, and their respective family members, with each side eliciting opposite opinions as to Nathaniel's development and health.

[23] While a new guardian *ad litem* was appointed in the instant case, his testimony and report was not part of the guardianship proceedings. We believe that guardian *ad litem's* testimony or a subsequent home study would have had a bearing on the trial court's determination as to who is best suited to have guardianship over Nathaniel. (*See* Indiana Code § 29-3-5-4(7) providing that when selecting a guardian, the court must give "due regard" to the "best interest of the incapacitated person"). Based on the fact that Nathaniel's interests were not adequately represented during the guardianship proceedings, we conclude that a reversible error occurred. On remand, we instruct the trial court to have GAL Shikany conduct his investigation, and a new hearing over Nathaniel's guardianship to be conducted.

## CONCLUSION

[24] Based on the foregoing, we hold that a reversible error occurred since Nathaniel's interests were not adequately represented during the guardianship proceedings. On remand we instruct the trial court to have GAL Shikany, or other qualified GAL appointed by the trial court, to conduct an investigation and file their report with the trial court. After such time, a hearing shall be held to determine the appropriate guardian for Nathaniel.

Reversed and remanded with instructions.

Mathias, J. and Bradford, J. concur